**Peter L. HORNER**

v.

**Patrick H. FLYNN and Motorcycle
Training Corp.**

Supreme Judicial Court of Maine.

March 6, 1975.

Bennett & Schwarz, P. A., by Barry Zimmerman, Peter J. DeTroy, III, John N. Kelly, Portland, for plaintiff.

Lipman, Parks & Livingston, P. A., by Sumner H. Lipman, John M. Parks, Augusta, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, ARCHIBALD and DELAHANTY, JJ.

POMEROY, Justice.

Of the many interesting issues raised by this defendant's appeal from a judgment entered on a jury verdict in favor of the plaintiff, one issue stands out as requiring extensive analysis and discussion.

The complaint alleged fraud.

The defendant requested the presiding Justice to instruct the jurors they could return a verdict for the plaintiff only if the evidence of fraud was *"clear and convincing."*

This the presiding Justice refused to do.

Instead he instructed the jury it was the responsibility of the plaintiff to persuade the jurors *"by a fair preponderance of the evidence"* in order to be entitled to a verdict against the defendant.

Stated succinctly, this issue raised by defendant's appeal is, is it error to fail to instruct a jury that evidence of fraud must be *"clear and convincing"* before fraud is *"proved"* [1] in a civil action.

In criminal cases there has been a demand for a high standard of persuasion expressed from ancient times. Thayer, Preliminary Treatise on Evidence, 558, 559 (1898).

The formula *"beyond a reasonable doubt"* is said by *May* in his Treatise, Reasonable Doubt in Civil and Criminal Cases, 10 Am.L.Rev. 642, 656 (1876), to have first appeared in the high treason cases tried in Dublin in 1789.

In Speiser v. Randall, 357 U.S. 513, 525, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958), the United States Supreme Court speaking through Mr. Justice Brennan said:

"There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of producing a sufficiency of proof in the first instance, and of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt."

See also In Re Winship, 397 U.S. 358, 360, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the concurring opinion by Mr. Justice Harlan.

In most civil actions the Courts, including our own, describe the burden of persuasion to be *"by a preponderance of the evidence"* or more often by a *"fair preponderance of the evidence."* Cf. Wiggin v. Sanborn, 161 Me. 175, 181, 210 A.2d 38 (1965).

In certain classes of cases properly denominated *"civil"* as opposed to *"criminal"* arising in equity, the Chancellor in determining questions of fact set standards for himself different in both kind and degree from that required in civil actions at law.

Thus in Peterson v. Grover, 20 Me. 363 (1841) the complainant in equity sought to correct an alleged mistake in a deed. The Court said relief could be had in equity only if the mistake *"be clearly proved or admitted."*

Later in Baker v. Vining, 30 Me. 121 (1849) a resulting trust was sought to be imposed. The Court discussing use of parol evidence contradicting the terms of the written instrument said at page 126:

"The same view was taken by Sir William Grant, Master of the Rolls, in Linch v. Linch, 10 Vesey, 511, and by Chancellor Kent, in Boyd v. McLean, 1 Johns. 582 where he says, the cases uni-

---

[1]. Throughout our discussion of the issue we intend to use the term *"proof"* in the sense it is used in the phrase *"burden of proof."* We use the phrase *"burden of proof"* to mean responsibility of the party on whom the burden is placed as to an issue to persuade the mind of the trier of facts as to the correctness of the position asserted as to that point by the requisite degree of conviction.

We hold there is only one *standard* in civil cases, i. e., preponderance of evidence but recognize that with respect to differing subject matter differing degrees of evidentiary cogency may be necessary to meet the governing standard.

What is preponderance depends upon what the issue is. For example, the quality of the evidence necessary to *"prove"* fraud is greater than that required to *"prove"* negligence.

formly show that the courts have been deeply impressed with the danger of this kind of proof as tending to perjury and the insecurity of paper title, and they have required the payment by the *cestui que trust* to be clearly proved. This Court have manifested a regret that long practice had established the doctrine, and have felt the necessity of requiring full and convincing proof of payment, as the basis of a resulting trust, in favor of the one making it against the person having the legal title. Buck v. Pike, 2 Fairf. 9. And so cautious have courts been in the reception of such evidence, although the proofs have been allowed to be read; yet if there was any secret in the cause not understood, the relief sought has been denied."

Still later in Tucker v. Madden, 44 Me. 206, 215 (1857), the Court said:

"Those who undertake to rectify an instrument in writing, by showing a mistake, undertake a task of great difficulty."

The opinion quotes with approval the language *"proof ought to be strongest possible"* and that the proof *"must be of the highest nature"* and again that it must be *"irrefragable evidence."* Again in the same opinion it is said there is requirement *"the evidence of the mistake was plenary, and left no doubt in the mind of its existence."*

In Parlin v. Small, 68 Me. 289, 290 (1878), an action in law based on claimed fraud tried before a jury, the Court said:

"They undertake to establish the alleged fraud entirely by their own testimony.

"Under these circumstances, what weight shall the oral testimony of parties to a suit have, to relieve themselves from the presumption of correctness that ordinarily attaches to a written instrument of such solemn and important nature as a deed? No doubt, oral evidence from parties alone may be suffi-

cient to establish a fraud that will upset a deed. But what shall the quantum and quality of it be?

"In Wharton's Ev. § 932, it is said: 'The evidence of fraud, in order to vacate a solemnly executed instrument, must be, it need scarcely be added, clear and strong; and this rule is the more important since the passage of the statute enabling parties to testify in their own cases.' In a note to the section cited, the author quotes from a Pennsylvania case as follows: 'Sharswood, J., said: "It has more than once been decided that it is error to submit a question of fraud upon slight parol evidence to overturn a written instrument. The evidence of fraud must be clear, precise and indubitable, otherwise it should be withdrawn from the jury. Since parties are allowed to testify in their own behalf, it has become still more necessary that this important rule should be adhered to and enforced."' The same views are expressed in as forcible terms by other authors and authorities.

"We concur in the doctrine thus strongly stated. Not that it is new. Our own decisions, in equity cases, have been to the same effect. Baker v. Vining, 30 Maine, 121. Peterson v. Grover, 20 Maine, 363. But, in view of the fact that questions of this kind are being more frequently agitated than they were before parties to the record were allowed to be witnesses, we think it well that the policy of the law upon the subject should be again emphatically affirmed. A deed seen and read as this was is a wall of evidence against oral assaults, to begin with. It should not be battered down for alleged deceits or misunderstandings, unless the proof of them is clearly and abundantly established. The plaintiff must prevail, not only upon a preponderance of evidence, but such preponderance must be based upon testimony that is clear and strong, satisfactory and convincing. Burleigh v. White, 64 Maine, 23, 27."

In Connor v. Pushor, 86 Me. 300, 302, 29 A. 1083, 1084 (1894), this language was used:

"The defendants urge that the jury were misdirected with regard to the amount of evidence necessary to establish the existence and contents of a lost and unrecorded deed. We think not. True, they were instructed that the evidence should be clear, convincing and satisfactory. But we think this instruction was correct. The plaintiffs had an unbroken record title extending back for over half a century; and the presumption in favor of record titles is so strong that it requires strong, clear and convincing proof to overcome it. This requirement does not militate against the rule that in civil suits a preponderance of evidence is all that is necessary. When an attempt is made to batter down recorded deeds by oral evidence of nonexisting and unrecorded deeds, the oral evidence must be clear and strong, satisfactory and convincing, or it will not preponderate. It must be 'plenary'."

In Liberty v. Haines, 103 Me. 182, 192, 68 A. 738, 742 (1907), it is said:

"It would appear from these citations that in this class of cases, the rule which obtains in the ordinary case is so modified in every common law jurisdiction, at least, that although all the while it only requires a preponderance of the evidence, yet to establish a preponderance, the proof must become 'clear, convincing and satisfactory.'"

And in Strout v. Lewis, 104 Me. 65, 68, 71 A. 137, 138 (1908), this language appears:

"In effect the proceeding here, involved the reforming of a written contract on the ground of fraud, and the law is well settled that to enable a court in equity to exercise this power, proof of the fraud must be full, clear and deci-

sive, and relief will not be granted where the evidence is loose, equivocal or contradictory or in its texture is open to doubt or opposing presumptions."

And finally in Wiggin v. Sanborn, supra, this Court said:

"Issues in civil cases need only be proved by the preponderance or greater weight of the evidence. Yet as to certain issues the *quality* of evidence essential to the proof must be of high degree, else it will not preponderate."

It is not surprising that confusion results when it is said that the law only requires a preponderance of the evidence, i. e., a tipping of the scales in civil cases, yet in *certain classes* of civil cases to bring about a tipping proof must become clear, convincing and satisfactory.[2]

Much of the confusion doubtless results from the use of adjectives describing the *quality* of the evidence rather than the required state of mind of the factfinder as to the strength of belief induced by the evidence.

■ It could well be argued as it was suggested in Baker v. Vining, supra, that certain kinds of evidence, for example oral evidence, ought not be useable to contradict the terms of a written instrument or correct an alleged mistake in a deed. However, once the decision is made that a certain kind of evidence is useable, its *quality* depends upon its capability to persuade the factfinder that it is true.

■ Any evidence which has the effect of inducing belief must be considered *quality* evidence.

■ Evidence is *"clear and convincing"* if by its nature it has high capability of inducing belief. If it is uncertain, ambiguous or contradictory it cannot be said to be *"clear and convincing"* only because

2. 9 Wigmore, on Evidence, § 2498 n. 1 (3d Ed. 1940), described the whole process of instructing juries as to the burden of proof

thereby "a wondrous cobweb of pedantry is here woven to occupy the jury's simple mind and the trial judge's tongue."

by its nature it lacks strong capacity to induce belief. Whether evidence which by its nature is capable of inducing belief *does in fact* induce belief is the responsibility of the factfinder to determine.

■ We think it is the considered policy of the law that a litigant who asserts fraud will be held to fail to meet his burden of proof by a preponderance of the evidence unless he produces evidence having strong capability to induce belief.

■ The degree of cogency which ought to be required to meet the standard of proof by a preponderance of the evidence in a civil case must depend in great measure upon the character of the issue to be tried.

■ Experience has taught us that in some types of disputed fact situations—such as where it is sought by oral evidence to dispute the terms of a written instrument or where it is claimed that the conduct of a party, which on the surface appears to be unobjectionable, had an underlying fraudulent purpose—evidence which is of dubious probative value will not convince reasonable minds. Both this probability and strong policy considerations in assuring reliance on written agreements impel courts to scrutinize carefully efforts to dispute orally what one has asserted in writing. Similar considerations argue against ascribing fraudulent intent to conduct which is otherwise not actionable.

As this Court said in Knowles v. Scribner, 57 Me. 495, 497 (1869):

"Thus, the proof must be stronger to support a charge of willful and malicious burning, than one of negligent burning merely; for there are many more careless persons than there are malicious ones, . . ."

In Strout v. Lewis, supra, the Court used the adjectives *"full, clear and decisive."* It suggested those adjectives were intended to mean the opposite of loose, equivocal and contradictory. It seems obvious the adjectives there used were intended to describe the *quality* of the evidence required and not the *extent to which the factfinder must be persuaded or convinced.*

In Wiggin v. Sanborn, supra, the Court went to some pains to make it clear it was the quality of the evidence to which the discussion related.

In Parlin v. Small, supra, the Court was discussing both the *"degree of belief required to establish that an assertion affirmatively made is true"* and the *quality* of the evidence useable as the means by which the mind of the factfinder could be persuaded.

Factfinding can never be a search for certainty.

■ In civil cases the factfinder must necessarily decide issues by a balance of probabilities. Moffie v. Slawsby, 77 N.H. 555, 94 A. 193 (1915).

■ To aid it in performing its responsibility the jury ought to be instructed as to the degree of belief-inducing capability which the evidence must have before it will be said that the jury is entitled to conclude that the burden of proof according to the standard of preponderance of the evidence has been satisfied.

■ In other words, the jury should be told that because of the nature of the issue, i. e., fraud, evidence will constitute preponderance only if it is clear evidence, convincing evidence and unequivocal evidence.

■ In this case the defendant requested the Court, in effect, to instruct the jury that a different standard of proof existed than that which exists in most civil cases. As we have seen the requested instruction was incorrect. At no time did the defendant ask the Court to instruct the jury that preponderance could result only from evidence which was of a quality appropriately described as clear and convincing. Nor was an objection made to the omission of

such a charge before the jury retired, as required by Rule 51(b), M.R.Civ.P.

Since we have concluded the jury ought to be so instructed, the question becomes whether the failure of the presiding Justice to do so, in the absence of an objection thereto, constitutes

"manifest error in law in the judge's charge to the jury . . . where as a result thereof, injustice results,"

so as to compel the granting of a new trial. Johnson v. Parsons, 153 Me. 103, 135 A.2d 273, 277 (1957).

" . . . this court has in certain cases reviewed questions of law both on motion for a new trial and on appeal, even though exceptions were not taken. State v. Wright, 128 Me. 404, 148 A. 141; State of Maine v. Mosley, 133 Me. 168, 175 A. 307; Trenton v. Brewer, 134 Me. 295, 186 A. 612; Springer v. Barnes, 137 Me. 17, 14 A.2d 503; Megquier v. De-Weaver, 139 Me. 95, 27 A.2d 399, and Cox v. Metropolitan Life Ins. Co., 139 Me. 167, 28 A.2d 143.

"Such review, however, is not compatible with best practice, and although there be error in an instruction, when no exception is taken, a new trial either on appeal or motion should not be granted unless, as stated in the above-cited cases, 'error in law * * * was highly prejudicial * * * and well calculated to result in injustice,' or 'injustice would otherwise inevitably result,' or 'the instruction was so plainly wrong and the point involved so vital * * * that the verdict must have been based upon a misconception of the law,' or 'When it is apparent from a review of all the record that a party has not had that impartial trial to which under the law he is entitled * * *.' We consider the foregoing applicable as well to an omission as to an erroneous instruction where no exception is taken. State v. Smith, 140 Me. 255, 285, 286, 37 A.2d 246, 259.

"This rule has been applied in civil as well as criminal cases. Pierce v. Rodliff, 95 Me. 346, 50 A. 32; Emery v. Fisher, 128 Me. 453, 148 A. 677; . . . " 135 A.2d at 277–278.

 A careful reading of the record in this case satisfies us that the trial Court's failure to instruct the jury as to the degree of belief-inducing capability which the evidence must have was not error of sufficient gravity to warrant relaxation of the rule that the omission of an instruction is not reviewable in the absence of an objection timely made.

The evidence is uncontroverted as to the following facts: Defendant represented to plaintiff that an investment of $20,000 would give him a 10% interest in the Motorcycle Training Corporation of which defendant was one of two shareholders.

When plaintiff expressed a willingness to invest in the Company, defendant told him that the other major investor was opposed to a new investor coming in because in six months the Company would be worth $500,000.

To corroborate such oral representations, defendant made available to plaintiff, prior to his investment, certain of the Company's *"confidential"* documents. Under the heading *"Organization"* one of these documents specified, *"Capitalization: $200,000."* Under the heading *"Sales,"* another sheet contained the following paragraph:

"Sold: Driver Education Programs"

Between them, both Maine and Massachusetts have purchased seven Trailer Model Nelson Simulators via federal grants for use in their driver education programs."

These financial sheets were obviously critical to plaintiff's decision to invest in the Company.

They indicated that the statements made by defendant relative to the present worth of the Company, were not mere opinion, or

"*puffing*," but rather facts upon which plaintiff could reasonably rely.

Plaintiff was then invited to visit the office and examine the Company files.

However, before these documents were made available to plaintiff, defendant instructed his secretary to remove any part of the records which would reveal the true financial structure of the corporation.[3]

At the time these representations were made to plaintiff, defendant *knew* that

(1) only one simulator had actually been sold;

(2) the stated capitalization figure of $200,000 was not true;

(3) the concealed files contained information showing that the actual cash investment in the corporation was no more than $11,000;

(4) the only money ever received for simulators sold was that paid to a predecessor company; and

(5) the Company was desperately in need of fresh money.[4]

It is axiomatic that one who is considering a substantial investment in a corporation must know by what amount it is actually capitalized, and how many sales of its product have been consummated. The record does not demonstrate that it was otherwise in the instant case.[5]

On the basis of his inspection of the proffered files, and specifically in reliance upon their corroboration of defendant's oral statements with respect to the worth of the Company, plaintiff did invest $20,000 in the Company in the form of one $10,000 and two $5,000 payments.

Although plaintiff eventually learned that the representations upon which he had relied and which had induced him to invest in the Company were, in fact, false, he did not do so until after he had paid the final installment of his total $20,000 investment. He could not have done so prior to that

3. "Q (The Court) What exactly did he say?
 A He said to remove Mr. Sidenberg's which were the accountants' files and different papers in there that had to do with money to do with the Corporation. How much was put into it and what it was set up for, Severin Beliveau's files, George Todd's files, the bank statements, the corporate files and anything else that had to do with money.
 Q (The Court) Is that exactly all of your present recollection of the conversation that you had with Mr. Flynn at that time?
 A He told me to put them away because he didn't want Mr. Horner looking at them.
 Q (The Court) Did he tell you why he didn't want Mr. Horner to look at them? Do you recall whether he told you why?
 A He told me that he didn't want Mr. Horner to see any part of the records that had to do with the Corporation money or anything."

4. In direct contradiction of defendant's statement to plaintiff that his (plaintiff's) investment was not needed and, indeed the other major stockholder was reluctant to allow him in, was a letter written by defendant to the corporation's accountant in late

January of 1970. In that document (admitted into evidence) defendant notified the accountant that "*contributions to equity*" were $11,000; that accounts receivable were but $5,500 and "*slow*;" that he planned to apply for a large foundation grant and "[*S*]*hould this method of raising money fail, we may put out a new issue . . . or sell to a larger firm.*"

5. The following colloquy evidences defendant's purpose in supplying plaintiff with the financial sheets:
 "Q Right. And the purpose of your giving them to Mr. Damon was because you wanted him to get a better understanding about the Corporation, was it not?
 A Yes, he just—he was very interested in doing it, in coming in and investing money, and becoming a part of the Corporation.
 Q And you felt that since Mr. Horner was interested, you had talked with him and he indicated that he was interested, did he not?
 A He indicated that he was interested, right.
 Q And you gave him these confidential sheets because you wanted him also to have a better understanding of the Corporation, right?
 A Right . . . ."

time, since he did not have access to the corporation checkbook.

 In Coffin v. Dodge, 146 Me. 3, 76 A.2d 541 (1950), this Court, relying on Crossman v. Bacon & Robinson Co., 119 Me. 105, 109 A. 487 (1920), described the 8 elements of actionable deceit:

(1) A material representation which is (2) false and (3) known to be false, or made recklessly as an assertion of fact without knowledge of its truth or falsity; (4) made with the intention that it shall be acted upon and (5) acted upon with damage; that (6) plaintiff relied upon the representations, (7) was induced to act upon them and (8) did not know them to be false, and by the exercise of reasonable care could not have ascertained their falsity.

The evidence in this case demonstrates that every element necessary to establish defendant's fraudulent conduct was proved affirmatively.

 To constitute the fraud relied upon in an action of deceit there must be a representation of a material fact (or omission to reveal a material fact) which is false and known to be false or made recklessly as an assertion of fact without knowledge of its truth or falsity, which is made with the intent that it be relied upon by plaintiff.

 The misrepresentation may consist as well in the concealment of what is true as in the assertion of what is false. Atwood v. Chapman, 68 Me. 38 (1877).

 Whether the misrepresentation is material is a question of law. Caswell v. Hunton, 87 Me. 277, 32 A. 899 (1895); Coffin v. Dodge, supra.

 As to the only elements of actionable deceit which were required to be supported by evidence clear and convincing in quality in order to be capable of being established according to the standard of proof by a preponderance of the evidence, there is no dispute.

Defendant concedes that he gave plaintiff information which he knew to be a misrepresentation of the Company's capitalization and completed sales, and deliberately withheld critical information relating to the Company's actual financial condition, at the same time that he was attempting to interest plaintiff in investing $20,000 in the Company.

 Therefore, we cannot say that the failure of the trial Court to give complete instructions was so "highly prejudicial" or "so plainly wrong and the point involved so vital" that "an injustice was inevitable" or "the verdict necessarily based upon a misconception of the law." Neither can it be said that "it is apparent from a review of all the record that a party has not had that impartial trial to which under the law he is entitled." Johnson v. Parsons, supra, 135 A.2d at 278.

In Prince v. Eastern S. S. Co., 109 Me. 395, 84 A. 894 (1912), this Court found an instruction which imposed an impossible degree of proof to be harmless error, where the plaintiff could not recover in any event.

Having admitted to a violation of navigation regulations, the plaintiff in *Prince* thereby precluded himself from being able to rebut the presumption that such violation contributed to the disaster at sea.

"The plaintiff did not show range lights, as the rules require. That fact being admitted, upon the decisions cited, the plaintiff cannot recover in any event, because it is impossible for him to show that the omission did not contribute; therefore the exceptions should not be sustained, and the case sent back for a useless trial." Prince v. Eastern S. S. Co., supra, 84 A. at 897.

Similarly, where the only issue on appeal was the question of defendant's liability as a matter of law, having resolved that issue

unfavorably as to him, the New Jersey Supreme Court in Stopford v. Boonton Molding Company, 56 N.J. 169, 265 A.2d 657 (1970), held that an erroneous charge relating to burden of proof was not so prejudicial as to require the futile exercise of a new trial.

That an allegedly erroneous charge on burden of proof is not so prejudicial as to warrant the grant of a new trial, where the facts demonstrate that appellant could not prevail in any event, was most recently decided by this Court in Wiggin v. Sanborn, supra.

In *Wiggin*, the Court reviewed the record and was satisfied that the plaintiff had not produced the quality of evidence which would entitle him to a jury determination on the dispositive issue in the case. Since he had not established the right to reach the jury, he could not show that he was prejudiced by an erroneous instruction.

In his second point of appeal appellant urges that no causal connection was shown to exist between the alleged misrepresentations and the damage sustained by the plaintiff. As a corollary to that issue, appellant claims that the evidence adduced at trial was insufficient to fix the amount of the damages, if any, which were sustained.

 That it is the burden of the plaintiff to prove affirmatively that he was actually harmed, and that his damages were the proximate result of his reliance upon the alleged misrepresentations is clear. Coffin v. Dodge, supra. Stewart v. Winter, 133 Me. 136, 174 A. 456 (1934).

 Difficulty in assigning an exact monetary value to the loss does not preclude submission of the issue to the jury so long as there is sufficient evidence that some monetary damage was sustained. Buzzell v. Cousens, 130 Me. 320, 322, 155 A. 736 (1931).

In reliance upon defendant's misrepresentations as to the worth of the Company, plaintiff invested $20,000. In exchange for his $20,000, he purchased 10% ownership in a company, the true value of which at the time of the sale was intentionally overrated.

Within four months of plaintiff's final payment the Company's worth was virtually nonexistent. Plaintiff's investment was never returned to him.

 That plaintiff sustained some pecuniary loss as a direct result of defendant's misrepresentations is not open to question. The measure of his loss is determined by the difference between the actual value of the property at the time of the purchase, and its value if it had been as represented (the *"benefit-of-the-bargain"* rule). Shine v. Dodge, 130 Me. 440, 442, 157 A. 318 (1931).

Recognizing the difficulty in determining the value of a company as of the date of an allegedly fraudulent sale, this Court has sanctioned the consideration of subsequent events as bearing on the issue of prior worth.

"Subsequent events in the history of a company, if not too remote in point of time, may be considered in determining what was its previous condition." Buzzell v. Cousens, supra, at 322, 155 A. at 737.

In addition to the testimony of the Receiver as to the insolvency of the Company in July, 1970, there was competent evidence from which the jury could reasonably have found that the Company was virtually worthless at the time plaintiff purchased his interest, only 4–6 months prior to the appointment of the Receiver. The most significant evidence in support of such a finding are documents indicating that, instead of the $200,000 represented to be the *"capitalization"* of the corporation, the only contributions to equity made at the time of plaintiff's investment was $11,000; that the corporation had accounts receivable of $5,500 which would be *"slow because they are tied to leases and federal grants;"* that the defendant was attempting to raise

money, failing which, sale of the corporation to a larger firm would be considered; that the inventor was being paid $5,000 for his patent rights; and that as treasurer of the corporation the defendant was not drawing any salary.

█ Applying the rule of recovery to a finding that the Company was worth little or nothing at the time plaintiff purchased an interest therein, the jury was justified in awarding plaintiff the entire $20,000.

*Waiver issue:*

Following his first investment of $10,000, but before payment of the second $10,000, plaintiff was told that the actual cash contribution of defendant and the other investor in the Company, was only $16,000. Appellant claims plaintiff's continued performance, despite his alleged knowledge of the falsity of defendant's original representations, constituted waiver of his right to an action for damages as to the second $10,000.

Appellant concedes that under the majority rule, a party who discovers fraud in a partially performed contract may continue performance and still seek a remedy in damages.[6] Nevertheless, he urges our adoption of a minority position which views continued performance of a severable contract with knowledge of the fraud tantamount to condoning the fraud, thereby constituting waiver of the right to recover damages resulting therefrom.[7]

█ At the same time plaintiff learned the cash investment in the Company was significantly less than originally represented, he was also told by the defendant that the investors had an agreement to put in $50,000—$60,000 *"when needed."* More-over, still concealed from him were the records which would have revealed the Company's true financial condition. Such evidence furnished the jury with substantial grounds for fairly and reasonably inferring that plaintiff did not have substantial knowledge of the fraud before he had fully performed, nor could he have discovered such fraud by the exercise of reasonable care.

█ Even if he could not establish that he could not discover the fraud by the exercise of reasonable care, because the misrepresentations were intentional, plaintiff was not required to do so. Pelkey v. Norton, 149 Me. 247, 99 A.2d 918 (1953).

"Many decisions hold that one guilty of actual fraud may not excuse his own wrongful acts by claiming that the person defrauded was guilty of contributory negligence." 99 A.2d 918, 920.

The *Pelkey* Court went on to quote extensively from Eastern Trust & Banking Company v. Cunningham, 103 Me. 455, 465–466, 70 A. 17, 22 (1908), as follows:

"But the defendant contends further, that, if the plaintiff did not know, it ought to have known, and would have known but for its own negligence. We think this defense cannot avail. There are cases which hold that where one carelessly relies upon a pretense of inherent absurdity and incredibility, upon mere idle talk, or upon a device so shadowy as not to be capable of imposing upon anyone, he must bear his misfortune, if injured. He must not shut his eyes to what is palpably before him. But that doctrine, if sound, is not applicable here. We think the well settled rule to be applied here is that if one *intentionally misrepresents to another facts*

---

6. See, *e. g.,* Dwyer v. Redmond, 103 Conn. 237, 130 A. 108 (1925); Haven v. Neal, 43 Minn. 315, 45 N.W. 612 (1890); Oswalt v. Cronk, 195 Iowa 230, 191 N.W. 978 (1923).

7. See Simon v. Goodyear Metallic Rubber Shoe Co., 105 F. 573 (6th Cir. 1900).

*particularly within his own knowledge,* with an intent that the other shall act upon them, and he does so act, he cannot afterwards excuse himself by saying 'You were foolish to believe me.' It does not lie in his mouth to say that the one trusting him was negligent." 99 A.2d 918, 920–921. (Emphasis supplied).

The facts in the present case bring it within the rule articulated in Pelkey v. Norton, supra.

We turn next to appellant's claim that the use at trial of an accounting report was prejudicial error. The document in question, covering the previous six-month period, had been commissioned by appellant, and received by him sometime in May, 1970. It was presented to appellant during cross-examination ostensibly for the purpose of refreshing his recollection of its contents.

Appellant recalled having received the report and agreed substantially with its contents. However, upon timely objection to any use of the figures contained in the report, the Court instructed the jury that specific figures mentioned during questioning were not to be considered as truthful. The trial Justice later ruled that the report itself was inadmissible as proof of the value of the corporation at the time of plaintiff's investment.

█ We do not consider that the use of this report, the probative value of which was at best cumulative in view of the Receiver's testimony as to the financial condition of the Company shortly after the period covered by the report, constitutes incurable error. The cautionary charge during trial and the trial Court's eventual refusal to admit the report served to vitiate any possible prejudicial impact upon the jury the mention of specific figures may have had.

Appellant's final point on appeal challenges the reference to specific sums of money relative to damages by plaintiff's counsel in closing argument. It is appellant's contention that any suggestion of a specific amount of recovery unduly influences the jurors, especially where, as in the instant case, compensatory damages are not easily calculated, and punitive damages by their very nature and purpose, lie within the jurors' own sound discretion.

In Duguay v. Gelinas, 104 N.H. 182, 182 A.2d 451 (1962), the New Hampshire Court addressed the issue of the propriety of allowing counsel to argue in summation that damages for pain and suffering may be measured by use of a mathematical (per diem) formula. Chief Justice Kenison, speaking for the Court, adopted the leading decision holding such argument to be improper. (Botta v. Brunner, 26 N.J. 82, 138 A.2d 713 (1958)).

"The chief vice of the formula is that it is an attempt by counsel to distort and exaggerate the measurement of what is immeasurable by such a mathematical method. The second vice of this type of argument in our opinion is that it will more often mislead a jury than aid them, since the jury are given an illusion of certainty by the use of figures which are not and cannot be substantiated by evidence." 182 A.2d 451, 453.

The Court nevertheless took the position that counsel could tell the jury the *total amount* he sought to recover for the damage sustained.

"We leave undisturbed Sanders v. Boston & M. Railroad, 77 N.H. 381, 92 A. 546 and Williams v. Williams, 87 N.H. 430, 182 A. 172 which allow counsel to argue to the jury the lump sum he seeks to recover or the *ad damnum* of the writ. To this limited extent we do not follow Botta v. Brunner, 26 N.J. 82, 138 A.2d 713, 60 A.L.R.2d 1331." 182 A.2d 451, 454.

It is unnecessary for us to discuss that portion of the Court's opinion in Duguay

v. Gelinas, supra, which relates to the propriety of counsel using a *"per diem"* formula in arguing damages for pain and suffering since that issue is not here before us.

■ However, like the New Hampshire Court, we expressly decide it is proper for counsel to argue to the jury the lump sum he seeks to recover in the case then on trial.

In the instant case the Court below committed no error in permitting such argument.

Since there was no error requiring reversal the entry must be,

Appeal denied.

WERNICK, J., did not sit.

All Justices concurring.